vs. Jenkins, Mr. Gilbert, whenever you're ready. Thank you, Chief Judge Diaz, and good morning to the Court, Judges Wilkinson and Judge Benjamin. May it please the Court, I am Joseph Gilbert and I am representing Jonathan Jenkins, the appellant in this case. This appeal primarily developed after the District Court denied Mr. Jenkins' motion to provide him the protections of federal Rule 410 and federal Rule of Criminal Procedure 11F. The District Court stated the Robertson test from the Fifth Circuit applies to this and Robertson basically puts the focus on a defendant's subjective belief that meeting with the prosecutor, in fact, is a clean negotiation. And then the second prong of Robertson is that one should use the totality of the circumstances. It's very fact-specific. One should use the totality of the circumstances to determine if a defendant's belief that plain negotiation occurring is reasonable. But the District Court then arbitrarily and irrationally drew incorrect inferences and conclusions contrary to the totality of the circumstances. For example, there's at least four times where the District Court made arbitrary and irrational inferences and conclusions. At page 97 of the Robertson first prong, that the defendant subjectively understands that plea negotiations are occurring, the District Court then said that the defendant subjectively knew that he was confessing to human trafficking and that was not part of one continuous plea discussion. The second Robertson prong, that the defendant's expectation that plea negotiations were occurring is that the District Court stated if Jenkins didn't subjectively understand that a human trafficking confession was admissible under Rule 410, then that expectation was not reasonable. So the District Court twisted the Robertson test. The second way the District Court's decision was arbitrary and irrational is when it concluded, essentially, and this, by the way, is the District Court's I'm citing now is at page 83 of the Joint Appendix and the actual language that the District Court was taking some quotes from is at pages 1442 to 1443 of the record. Essentially, the court concluded that the parties agreed early on in the discussions that Jenkins will take most of the charges and will give the prosecution information on our cases, the sex cases, current charges, and that his nephew, Mr. Wallace, will receive some consideration from the prosecution. Okay, so that's the agreement that the District Court concludes was made and the District Court concluded it was made because Jenkins said let's talk then. Of It's fairly clear and that is if there's an admission made during plea negotiations, it's inadmissible. But if it's made during the performance, it's admissible. And so isn't the question that we have before us simply which is which? And as to the question of which is which, is that not a factual finding? Well, Your Honor, first, I just want to make sure that I'm clear on behalf of Mr. Jenkins that we dispute that an agreement was reached at all during this one agreement was reached. Do you disagree that he was engaged in plea negotiations? Absolutely not. It's clear because for one thing, he was in custody. He had been charged with this offense and the conversation included multiple mentions by Mr. Jenkins, by Detective Pate, and by Assistant District Attorney Sandling about pleas or charges throughout the entire session. So it was clearly a plea negotiation. It's interesting because when this first arose, of course, it was state charges. And this was litigated in state court as well because North Carolina also has a Rule 410. Was the District Court confused on the proposition of law? Did the District Court confuse the proposition of law? Or is your quarrel what he found to be statements made during the plea negotiations and statements made during performance of the agreement? Well, where did the District Court err? It erred on the latter of those, didn't it? Well, I'm glad you asked that question, Judge Wilkinson, because standard of questions of law, obviously, this court's going to... I'm asking you if there was an error of law here. Well, I think there was an error of law, and that's the error of law by the District Judge was ruling that, in fact, an agreement... Well, first of all, the error of law was misapplying the standard that the court itself chose, which was the Fifth Circuit standard. Well, the application... You used the word application. The application of a correct standard of law is often a factual matter, is it? That's correct, Your Honor, and that's another dispute that we have. We believe that the District Court made factual conclusions in its order that were not supported by the record and, in fact, contradicted by the totality of the during the course of... If you don't mind, I'll go back to what I was saying about the... Well, let me ask... So, I mean, I don't know that this case is all that complicated, and maybe I'm just simplifying it too much, but you hit on the... Towards the latter part of your beginning argument, the question here is whether that portion of the transcript that you described where Jenkins... And the District Court essentially quoted it. He said, Sandling and Jenkins outlined the terms of the plea agreement. Jenkins would plead guilty to some of the human trafficking charges and the firearms charges. Jenkins would provide information about those charges. He would also provide information about the homicide in exchange the state promised to dismiss, and it goes on. But, I mean, subparagraph number one, Jenkins would plead guilty to some of the human... What does that mean? Which ones? It's not clear. It just... In my mind, that's a real problem right from the get-go, and part of the problem here is the agreement was never reduced to writing, and throughout the engagement back and forth with the prosecutor and the detectives, Jenkins continues to hem and haw about not wanting to plead guilty to charges of trafficking involving a minor. He was very concerned about that, and so it's not clear whether or not he was compelled to plead guilty to that offense. I mean, the agreement on its face doesn't say. Exactly, Your Honor, and the other thing that you didn't say that I think is important to this is that not only was Jenkins continually coming back and forth trying to get his core objectives met, but the prosecution, the prosecutor and the detectives, both Pate and Linder, continually kept bringing up things. In fact, right after the district court said that an agreement was made, Detective Pate immediately starts adding more terms. I'm certainly not well-equipped to try to contest with this court civil law. However, when I think back, way back, to contract law in law school, it seems to me that with a contract, you have an offer, then you have an acceptance, or you can have counteroffer, which necessarily implies rejection of the offer, and then, eventually, you have a meeting of the minds. That's when you have a contract. There was never a meeting of the minds in this case, and the prosecutor and the detectives kept adding new things, kept eliciting more information. It was very clear that this was kind of like the equivalent of a proffer meeting. If a lawyer had gone in to meet with the prosecutor at a proffer meeting, first of all, we know since 1995, according to the Supreme Court case of Mazzanato, prosecutors commonly require a 410 waiver. We don't have that here, and I'm not suggesting that they have to have a 410 waiver, but that is certainly part of the totality of the circumstances. What didn't occur here? There's so many things. If they had occurred here, we wouldn't be here right now on this claim, and that is, if anyone had clearly explained to Jenkins, the ADA particularly, what are the specific terms of the agreement, and if they had requested his assent to those terms, not coming back retrospectively and saying, oh, he said, okay, let's talk, Ben, that that somehow indicates assent. Well, the government's position is that once the deal was in place, whatever that deal was, then your client was then attempting to modify the terms of that agreement, and he wasn't allowed to. That's exactly what we're asking this court not to do. All the law that's cited by the parties on both sides in this case substantially comes from other circuits, and so if this court is going to make a ruling about how an agreement was made in this case or whether Jenkins was reasonably negotiating the entire time, we ask the court to require that at least something be memorialized, at least something be explained to the defendant. When you have the only lawyer in the room is a prosecutor, and now we're going to go back retrospectively and say, hey, 410 really gives the government problems in this case, because the plain language of 410 and what happened here clearly suggests that this should be suppressed. But when clever lawyering comes in retrospectively and says, wait a minute, for the first time, because no cases I could find have ever said this, but says, you know what, what if we parse through and we pick and choose certain things that Mr. Jenkins said, and then we can say, at that point, there was an agreement, because once an agreement is reached... Let me ask this. The chief makes a good point that this wasn't reduced to writing, but the claim is made by the government that he knew what he was pleading guilty to human trafficking charges and a firearm charge, and he was going to provide information about those charges, and provide information about a homicide on the condition that the charges against his nephew were inculpatory statements that he made within that framework. Did they relate to the human trafficking charges and the firearm charges to which he had pled? Well, the firearm... He didn't plead, Your Honor. It was a five-day trial, but I'm not sure I really understand your question. Excuse me, what did you say? I said it was a five-day trial, Your Honor. He didn't plead, so I'm not sure if I misunderstood your question. Well, and I don't want to speak for Judge Wilkinson, but I thought the question he asked was, did your client, after saying, let's talk then, actually describe his involvement in the human trafficking charges and the possession of a firearm by a felon? He did that, right? One would certainly conclude that from the interview, but the important point I want to make about that is the way the district court characterized this is that he just confessed, and he told them the whole thing, but in reality, it was a give-and-take. He was responding to specific questions that were proposed to him by the detective. But the government ended up using those statements at trial because they were, in fact, inculpatory with respect to the offenses that he had been charged with. Of course, he also talked about some murders, apparently, that he was involved in. So I think it's fair to say that he made the statements after thinking, believing that he had an agreement in place when he said, let's talk then. But that doesn't answer the question as to whether or not there was, in fact, an agreement to begin with and exactly what the scope of the agreement was. And I go back to the one paragraph in the transcript. Ms. Sandling, the state prosecutor, said, you wanted to take most of the charges in exchange for providing information on our cases, the sex cases, the human trafficking cases that you're charged with, and the firearm by a felon, in exchange for giving Antoine Wallace, his nephew, some consideration. What does that mean? That's what I mean, Your Honor. And again, that's why, like I said, there are so many ways we wouldn't be here. If there had been a written requirement, as required by North Carolina state felony law cases and regularly used in federal court, as long as I've been practicing, it's always been in writing, written agreement would have kept us right out of this. And that aspect of the written agreement is also significant to the totality of the circumstances. Remember, the test is what's going on in Jenkins' mind. And is that reasonable? That's the test that's established by Robertson. And I thought the confession related to the human trafficking charges. And I thought the human trafficking charges were ones where Mr. Jenkins, to which Mr. Jenkins had pled. No. I mean, he pled not guilty to the human trafficking charges, Your Honor. But the point I was trying to make, Your Honor, which I think is kind of significant to what you're also driving at, and that is, what's going on in Jenkins' mind? What's his life experiences based on the record? And we know because he mentioned in response to their questions about the killing of Richard Vestal. Richard Vestal was the case in the PSR, the paragraph, and that's in our sealed appendix. But Jenkins' prior experience was having done an Alfred plea to the second degree murder of Mr. Vestal, who took up a good part of the time in this discussion. So that was his prior thing. And at that time, Mr. Jenkins, in keeping with North Carolina policy, had participated in a written plea agreement. And so it's reasonable to believe that Mr. Jenkins is the entire time waiting and believing that maybe we're going to have another meeting and then they're going to bring me an agreement and then we'll go from there. Like I said, I'm out of time, so I'd like to reserve. You've got some time reserved. Thank you very much, Mr. Gilbert. Ms. Brown, we'll hear from you. Thank you, Your Honor. Lucy Brown for the United States, and may it please the Court. I understand that once I start talking, everything I said will be used against me in a court of law. In a 1,500-page JA, this line said by the defendant, Jonathan Jenkins, is one of the most important ones because it shows two things. First, that he understood the difference between a negotiation with that state prosecutor and the confession that would come later as a result and after those negotiations. Did he understand 410? He's there. He has no lawyer. There's nothing in writing. Does he even know what Rule 410 is? Did he understand that he was waiving his rights under 410? I don't think he had to waive his rights under 410 because 410 does not protect statements unless they are plea negotiations, and that's not what the confession was in this case. So I don't think the issue is about waiver. That's a step too far. There's first this threshold question of was this a plea negotiation or was this something else? And he did understand the difference between a negotiation and something else. His statements throughout that interchange that day make that very clear. Those statements include things like, I realize after I finish talking I'm not going home. I'm not going to say too much right now until we get somewhere. He knew that there was a phase of this interaction that was figuring out a deal, that back and forth, and then he knew that he would have to perform on that deal, which is what he did when he gave that two-hour confession to the human trafficking conduct. And the tenor of those two parts of that discussion back set up. It further shows his understanding and really everyone's understanding in the room that day, though of course we're focused on Mr. Jenkins. And I guess in follow-up to Chief Judge Diaz, I'm not sure we even understand. They said these conditions and I mean it's very broad as to what the agreement is. So how is he to understand it if we are here today and reading the transcript and we don't necessarily understand what the agreement was between him and the prosecution? And so 410 doesn't require a completed plea deal. That's not the realm we necessarily have to be discussing. It also brings in or participated in plea discussions. So I understand the court that this was a casual compared to what we often see in federal court. This was a more casual plea discussion, but it doesn't require an absolute completed deal where everyone understands every single term. The question before this court is just were these statements made during negotiations or were they something else? And I think the defendant understood the difference between negotiations and then something else. It's not predicated on having a completely finalized deal. It's predicated on his understanding of was this part of a negotiation or not. But doesn't he continue to bring up the death penalty during his confession and I think the prosecution says, oh, no, we'll have to talk about that later. He discusses the murder and he continues to try to negotiate. So how does he understand the difference between the negotiations and his confession? I don't think that he brings up negotiation in the confession portion. He does go back and forth, certainly, and tries to say things like I don't want the death penalty. I want to serve my time stateside. Those were still attempts at negotiating. The confession is this two hour block of time that it feels different. It reads differently. That's the only part that was admitted at trial and in that two hour block of time, he only made two short references to the deal and they were of a more clarifying or confirmatory nature. Is this covered? If I say this, will it affect my nephew? It was not a back and forth about terms. I would say the discussion about I don't want the death penalty. I want to serve my time at the state. That was still part of a negotiation. That was about terms and it was more back and forth about what those terms would be. The government will consider part of the negotiation protected by 410 and never offered against Mr. Jenkins. What was offered against him was this different phase of that discussion that was about the human trafficking conduct. The tenor of that discussion was different. It was not, hey, what about this term? What's your nephew going to say to this? If we give you this, we want this in exchange. Instead, it was questions about the crime itself. It was the defendant explaining, here's how I recruited these young women and girls. Here's how I would abuse their minds every day. Here's how I would use putting hands on them to keep them in line. Here's how I would take these images of them and post them online. Here's how I would tell them I was a spiritual leader named Obed who would abuse them physically. Can we back up a little bit, Ms. Brown, because you said something that I'm still trying to wrap my head around. You seem to be saying that the statements that even if the agreement in this case isn't sufficiently definite as to amount to a contract, as we would typically understand it, that Mr. Jenkins' statements still would have been admissible because they were made during the negotiations. Is that what you're saying? No, Your Honor. I'm sorry? What are you saying? Statements made during the negotiation are not admissible, and the government did not admit those. We would not argue otherwise. I don't think that the rule requires a completely final, formalized deal for him to know that his confession would be used against him. That's not the question. The question isn't was there a completely final, formalized deal. The question was… Isn't that what the district court answered in this case? I think the district court believed that there was, but the question… Okay, so if the district court was wrong about that, okay, you're saying that the statements are nonetheless admissible. Why? Because they are not protected plea negotiations. Why? Because they are something else. They are a confession made pursuant to those plea discussions, which is the term used in Rule 410. I think it was the district court's position, and the government would agree that there was a deal. Was it formalized page by page in a thick document like we like to see in federal court? It wasn't. We know that. So we would think… Okay, but 410 says that you can't admit statements made during plea discussions if the discussions didn't result in a guilty plea, right? So there was no guilty plea in this case because it was withdrawn. That's correct. There was never a guilty plea. All right, so why are the statements inadmissible? These statements, the only ones that were admitted at trial, which are not the back-and-forth about terms. The government recognizes negotiations occurred. They were never admitted. The statements that were admitted at trial were that two-hour confession about the human trafficking conduct. That was not a negotiation. That was not a dickering about terms. That was not a back-and-forth about here's where I want to serve, here's what I want to plead to. That was Jonathan Jenkins performing his understanding of what had happened that day, and he knew that. He said, once I start talking, everything I say will be held against me in a court of law. Did the district court make this analysis that you're now suggesting as the basis for affirming? I'm sorry? Did the district court make the same analysis and argument that you're making now as a different basis for affirming? I'm not sure I would argue that it's a different basis. The district court found that the statements admitted at trial were not pursuant to a plea. They were not plea negotiations. It certainly made that. That is what we are arguing today. That's the district court's holding after that fact-intensive inquiry, and that is what we are arguing now. I understand your honor to be concerned about whether that plea deal was formalized, and so I'm trying to respond to that question. But certainly our position has never changed, and it is what the district court held below. These statements, the ones admitted at trial, were not a plea negotiation. They were a confession following plea discussions. Following a consummation of a plea agreement? That was the district court's ruling, yes, and the government would agree. So if the district court was wrong about that, then what's the basis again for affirming? Because the question is whether those statements were a plea negotiation, and that's an independent question. That was not a negotiation. That was not a back-and-forth about terms. Absolutely, but the only reason that they were given was because the defendant understood or thought, and the government understood or thought, that there was a plea agreement in place. But the defendant didn't think that portion was a plea negotiation. That's the difference. You're putting a lot on the defendant who's there without his lawyer. I am putting a lot on the defendant. That's the test, the Robertson test that the district court used. It's not putting a lot on him in the sense of legal understanding. It's putting a lot on what his understanding was, and his understanding was, I'm going to negotiate a deal, and once I have a deal in place or think that I have a deal in place, then I'm going to tell you everything you need to know. And I agree. But if he doesn't have a deal, because there was no deal consummated, then why should those statements be used against him? Because I don't think that the question the rule asks is simply, were these statements a plea negotiation themselves? And they were not. That's literally true, but it doesn't answer the question about his understanding of why he made the statements to begin with. I think he understood that he did have a deal. Can I ask what other courts have said about two points? First of all, whether a formal memorialized plea agreement was reduced to writing, and if it was not reduced to writing, do you commit a violation? Because negotiations could be understood as ongoing. So I want to know what other courts have said about the question of whether the plea negotiations or the plea agreement must be memorialized and reduced to writing. And then the other point I would like to review, I want to know what other courts have said in terms of the subjective knowledge or expectation that the confession would be used against him. One of the things as a general matter that I note here, the courts place a great deal of emphasis on the voluntariness of a confession, and this seems to me voluntary. He was given, the individual was given Miranda warnings. There was no deception used as far as I can tell. The prosecution is not accused of using any kind of deception. So given the fact that the touchstone of so many confessions is voluntariness and whether Miranda warnings have been given and whether they've been waived or what have you, this confession was, as far as I can see, was not coerced. The rules of the game were made plain. But I want to know those two points. One, whether other courts have required that the plea negotiations be memorialized and reduced to a formal plea agreement. And the second point I want to know about is what part does other courts say a defendant's knowledge that a confession would be used against him, what part does that play in determining whether the confession was a product of negotiations or performance? Tell me those two points. Yes, Your Honor. To your first, the cases Knight and Little cited by the government below, and I believe in our brief here, which are an 11th Circuit case that was published and a 6th Circuit case that was unpublished. Those also involved plea agreements that were not reduced to writing. So that answers your first question. They're explicit on the fact that the plea agreement does not need to be reduced to writing. I don't know that that's the holding, but that's the facts in that case. Those involved plea agreements that were not reduced to writing and were upheld. The confessions that were upheld were in the context of plea agreements that were not reduced to writing. Of verbal plea agreements. Then the confession was given. We would be creating something of a circuit split if we were to imply or hold that a memorialized plea agreement was necessary for something to be admitted into evidence. That would be different than the 6th and 11th Circuits have said. Yes, Your Honor. Okay. And to your second question, I think his understanding that the statements would be used against him went to his understanding that there was a difference in this negotiation phase and then the confession phase pursuant to those negotiations. And I do think that there was a substantial understanding on both parties as to what those terms were. You don't generally get a statement that says, I understand. I'm sorry. This will be used against me. Correct. And you look at where courts want to go with confessions. What the courts place primary emphasis upon is whether the confession, first of all, Miranda warnings were given. But the question is whether the confession was voluntary and intelligent. And how could the statement that I understand what's going to be used against me in court, how could that not go to voluntariness and intelligence? It goes right directly to he's not being forced. And it goes to intelligence in the sense that he knows the implications and consequences of what he's doing. So given the fact that these other circuits have not required a memorialized plea agreement in order for the confession to be admitted, and given the fact that Miranda warnings reinforce the bedrock quality of confessions, they must be voluntary, they must be intelligent. That statement goes to both prongs of that. And add to that the fact that these are the questions between a statement made during negotiation and a statement made during performance. Those are factual. Yes, Your Honor. Because the district court is, again, in a better position to appreciate these things than we are. I've suspected something resembling a clear error standard unless we fashion a rule of law that says memorialization is essential, or that knowledge of confession is going to be used against him is immaterial. Now, those are two propositions of law we could try to establish here. But I suggest they may be wrong, and I suggest they could well create a circuit split. And again, we had a five-day jury trial on what was going on here. Brutal acts of sex abuse where women were choked and reduced to the point of unconsciousness. And we're going to reverse the district court? It's clearly erroneous. We're going to create a circuit split on memorialization? We're going to create a circuit split on holding that subjective appreciation is irrelevant? And once again, put some of the victims through what they went through? You have to think about this stuff. Yes, Your Honor. I tried this case, and I agree with your assessment that it was horrific conduct. I have no quarrel with most of what Judge Wilkinson said, not all of it. It is, in fact, a horrific crime. But I think we need to get back to the circumstances of what happened here. In the abstract, certainly a voluntary confession with Mirandized warnings is entirely admissible. I don't think anyone disputes that. But the question is, in what context were these statements given? And the district court, in its order, framed the arguments this way. Jenkins argued first that his confession was inadmissible under Federal Rule 410 because he engaged in plea negotiations throughout the entire conversation. And you said you tried this case, and you said, you responded, that he confessed after reaching a plea agreement with the state and that he understood the plea terms and the like. And the district court took those arguments, addressed them directly, and found that, in fact, it was a binding plea agreement. And I don't disagree that you don't need to have it memorialized in writing. Oral agreements are fine, although, you know, when you engage in oral negotiations, the very problems that happened here are likely to come up more often. So the question is, frame that way, the district court finding, in fact, that there was a binding plea agreement. I'm left with the question I asked Mr. Gilbert. What's the agreement? The agreement the district court held is a JA-93. He said Jenkins would plead guilty to some of the human trafficking. Okay, stop right there. Some. Which ones? My understanding would be that it was the human trafficking not related to a child. My understanding may be that, but what was Jenkins' understanding? Jenkins' understanding was that he was pleading guilty to human trafficking. Which ones? I don't know that specifically, but I don't think that makes a difference. Why not? As to his understanding of whether the confession. Does it make a difference as to whether or not the plea agreement was enforceable as a matter of contract law? There never was an enforcement because he withdrew. I understand, but that agreement on its face, is that enforceable as a matter of contract law? I'm not sure. I can't say for certain that it was, but I don't think that that is a necessary And I realize I'm out of time. May I answer your question? No, you're going to keep answering as long as I'm talking. Thank you, your honor. I don't think that that is a necessary precondition to the question before this court. I think Jenkins knew that first prong of the test in Robertson, that when he gave that two-hour confession, that was something pursuant to that plea. Could he have said in that moment precisely the crimes? I'm not sure, but he did know he'd come to an agreement with the state that he was going to plead guilty to human trafficking, that he was going to provide this debrief, and he was going to speak about another murder. In exchange, the state was going to dismiss the human trafficking charges against his nephew, which is the thing he wanted. He unequivocally got that. They were going to let his nephew get probation rather than a custodial sentence, and they were going to listen to him speak about the murder, not making any explicit promises there. That was the agreement. Let's say that's the deal, and then you get to trial. At trial, he says, I'm agreeing to plead guilty to counts one and four, but I'm not pleading guilty to two and three, or I'm agreeing to plead guilty to count one. I don't want to plead guilty to other three counts of human trafficking. And the government says, well, wait a minute, you agreed to plead guilty to some of them, and our definition of some are the first three counts. Is that the problem? I understand your question, and I do think this is a circumstance that is not as formalized as we often see. I recognize that, certainly, Your Honor. This was an evolving circumstance brought about by the defendant initiating this conversation because he wanted to get what he was concerned about. I think that's a bit unfair. This guy's in there, and again, I'm not making light of the offenses in this case because they are horrific. He's not a lawyer. The lawyers in this case should have known better than to engage in negotiations in this way. And I want to go back to the district court, and you made this point. Jenkins understood the difference between protected plea negotiations and an admissible confession. You made that point. That's absolutely right. That's what the district court said. But in the next paragraph, the district court said, Jenkins insisted on a plea agreement before making a statement. That was the whole premise of his talking to the government. And if you don't have a plea agreement that's binding to begin with, where are you? I think he believed, and I think he did. That was the district court's holding entitled to great deference by this court, and the government would agree that there was a plea agreement. And he knew that, saying it would be a Pyrrhic victory. He was a very sophisticated defendant and well-educated. It would be a Pyrrhic victory if I just talked and nothing is confirmed. He knew, I need to get this deal, I need to secure what I care about, and then I'll give them what they care about, which is this confession. Let me ask you this. This is something you said earlier. This is about terms. This is not about the confession. So what's the terms, and I think this is what Chief Judge Diaz is trying to get to, what's the terms as to what he's going to plead guilty to? He said, I don't want to plead any trafficking charges that involve minors. Is that a term? I mean, we don't know. I certainly agree that you, Judge Diaz, and you, Judge Benjamin, have located the loosest part of this. I don't disagree. The district court found he would plead guilty to some of the human trafficking charges. That does not name a specific count. I understand that. But he knew that he was pleading guilty to human trafficking. My understanding is there were sort of two options, human trafficking or that sexual servitude of a minor. So he knew he was pleading guilty to human trafficking charges, and he knew that as a result, to get what he wanted, which he did, that his nephew would not have human trafficking charges at the state and that his nephew would get probation on the dramatically lower charges. He would have to give the state what they wanted. He was a sophisticated actor in this way. Let me ask you this. Because you cite Little and Knight, were they both represented by counsel during those negotiations? I'm not certain, but I believe they were. That's the 6th and the 11th Circuit case? Yes, Your Honor, it is. Okay. And then I guess my last question is to, if I may. Absolutely. Mazinato, it's kind of interesting because this is where I started with 410. The Supreme Court talks about plea negotiations and the importance of Rule 410, and in that case having an explicit waiver language in an agreement. And there the court said that, you know, prosecution may use a plea agreement for purposes of impeachment, and that was the 410 waiver in that case. But in there they expressed, even the concurrent justices expressed a concern about plea negotiations being used in a case in chief. And so we do have, I mean, we have Mazinato. I mean, I know the district court used a 6th Circuit case and an 11th Circuit case, I believe there's an 8th Circuit hair case or something like that. But isn't the purpose of 410 for negotiations, for statements made of or for or during or not to be used during a trial? Yes, Your Honor, and the plea negotiation statements were never used at trial. All right, thank you very much, Ms. Brown. Thank you. Please affirm. Mr. Gilbert. Thank you, Chief Ches Diaz. First, I want to make something really clear. We're not conceding that oral agreements are okay. And I appreciate what Judge Wilkinson said, looking for other circuits. But the district court specifically cited the Knight case for the proposition that oral agreements are permissible. That's the only one out there. Pretty much everything else, there's writings involved. And, in fact, in the Knight case, as I'm sure you're well aware, the appellate court relied strongly on the fact that in Garrison's opening appellate brief, Garrison conceded that she accepted the agreement's offer, allowing her to plead to a one-count indictment. So that's a pretty important distinction from our case here as well. Also, the Little case cited by the district court, in that case, the court also said that offers of leniency in the course of police interrogations can sometimes have a coercive effect, which we believe clearly occurred in this case as well. What do you make of the last statement that the government made in response to Judge Benjamin's good question, that the statements made during plea negotiations were not introduced at trial? Does that make a difference to you? Well, statements that are made in the course of plea negotiations should not be used at trial, and that's the whole point of why we're here. Statements made during the course of plea negotiations were not introduced at trial. That's what the government represented. Right. You take issue with that? You don't? No, I agree, Your Honor. Were they or were they not? No, the government left out. I mean, the jury was not shown. Can I get a direct answer to my question? Were statements made during the course of plea negotiations introduced during the trial? Our position is, yes, Your Honor. I agree with you that what the government said and the district court ruled is we're going to edit this thing so that all the preliminary discussions. Which statements made during plea negotiations were introduced at trial? All of them, Your Honor. That's our position. What? Everything that had to do with this human trafficking case was introduced at trial, and it's our position that that was during plea negotiations. But the question between negotiation and performance is one of timing. It's one of sequence. Now, if the statements were introduced or made after the agreement to dismiss charges against this gentleman's nephew in return for pleading guilty to some human trafficking violations, the question I have is one of timing. I realize the statements themselves were introduced, but I think the question is when were they made? Were they made during negotiations or were they made after negotiations had concluded? And the government is saying that no, the statements made during negotiation were not introduced at trial. Now, if that's correct, if that is correct, perhaps, if you don't think it's correct, maybe you could point me to certain pages in the appendix where statements made during plea negotiations were introduced at trial. I'm not talking about statements that may have reflected something in plea negotiations. I'm just wondering whether the statements made during negotiations were introduced or whether the statements introduced were part of a confession that was made after the government had dismissed the charges against Wallace or whatever this gentleman's nephew's name was. That happened after all of this, Your Honor. What's that? The dismissal of charges against Wallace happened after this entire meeting. But I see where you're going with this, Judge Wilkinson, and that's the question this court will decide. The government says, no, the plea negotiations were really just the first couple of minutes. And after all, Jenkins said right immediately after signing the written acknowledgement of his Fifth Amendment and Sixth Amendment rights that he … But, excuse me, Counselor, he knew what he was getting,  dismissed. And in return, he was going to plead. And now it seems to me you're letting him have his cake and eat it too. And he gets the benefit. He knows what the benefit is. The negotiations are concluded. The government has performed. As I understand it, before the trial or whenever, the government dismissed the charges against Wallace. When did they dismiss the charges against Wallace? I'm out of time. Keep talking. So to be very clear about that, Your Honor, the government did not dismiss the charges. What happened is after the meeting, Wallace was allowed to plead guilty to possession of marijuana with intent to distribute and to a firearm charge and to receive probation. That's what actually happened after the thing. But, Your Honor, in response to your question, this totality of the circumstances showed that Mr. Jenkins had five core objectives that he wanted from the plea deal, and no agreement was ever reached as to those. And there was back and forth between both sides. Charges against Wallace to be dropped, that didn't happen. They just modified that. Second, no child human trafficking charges for Jenkins. That was discussed, but there was no clear agreement. Are you saying that the government didn't perform as part of the plea deal? No, Your Honor. Are you? Well, again, there isn't an agreement. That's our whole position. Are you contending that the government did not dismiss the charges against Wallace? The government initially dismissed the human trafficking charges against Wallace after he made that plea for probation, but then they resurrected them because they went to Jenkins' lawyer, my colleague, Ray Tarleton, and said to him, will you plead to murdering Whitfield for a life sentence? And Jenkins said no. So the government at that point resurrected the charges against Wallace and then it went federal. I feel like I'm not getting a real clear view of the timeline, but I'll have to. May I just answer one more thing, Your Honor, that came up very briefly. If Mr. Jenkins was mistaken and thought, you know, all this stuff is going to come back to hurt me, the fact that a person mistakenly believes that something is going to be admissible does not erase his protections. For example, priest, penitent, spousal, attorney, client. If a person says, as soon as I talk to you, I know this is going to end up, you know, this is going to all be used against me, even though that's wrong, it doesn't eviscerate those privileges. And in this case, just because Jenkins believed that by signing Fifth Amendment and Sixth Amendment waivers, statements could be used against him, is really here or there as to whether the core objectives, which included no death penalty, do my time in North Carolina, and doesn't want Wallace to be labeled a snitch, which there was discussion back and forth throughout the entire negotiation. And with that, Your Honor, I just would rest on our brief and ask you to vacate and remand for a new trial. Thank you, Mr. Gold. May I ask one more question? So if we were to decide that there was an error by the district court in admitting the statement, how is that not harmless when the evidence was overwhelming? Wallace actually ended up testifying against them. The victims testified. Wallace testified. How is that not a harmless error? Thank you, Judge Benjamin, for asking me that question. That was going to be my last point of my initial outline. The error was not harmless because the strongest proof under the law is a confession, and it is likely the center of the jury's attention, especially when the prosecution emphasizes the confession in its opening statement and also in its closing, the last words that the jury hears from the attorneys. The government opened. This is at Joint Appendix 143. The government raised an opening statement, and then in the first closing argument, the government played 18 clips from the confession, and I can give you the sites to those if you'd like to the Joint Appendix. And then in the final closing argument, the jury, again, three different times, at 1126, 1130, and 1131 of the record, did that. So it's devastating, and that's my response to the court's question about harmless error. I also don't think the government made that argument in its brief in any event about harmless error. That's correct, Your Honor. I pointed that out, I believe, in my rebuttal. All right. Thank you, Mr. Gilbert.  Mr. Gilbert, I note that you, too, are court-appointed on behalf of the court. Thank you for your service to the court in this important case. We could not do our work without lawyers like you, so thank you very much. Judge Benjamin and I are going to come down and greet counsel, then we're going to take a brief recess before moving on to our next two cases.
judges: Albert Diaz, J. Harvie Wilkinson III, DeAndrea Gist Benjamin